## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SAFETY INSURANCE COMPANY,** ) | |
| **as subrogee of WALTER NEAS,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.** |
| ) | **19-12012-FDS** |
| **v.** ) | |
| ) | |
| **MARLETTE HOMES, INC. and** ) | |
| **CMH MANUFACTURING, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a lawsuit arising from a fire that occurred in a manufactured home.  Plaintiff

Safety Insurance Company, as subrogee of Walter Neas, alleges that defendants Marlette Homes,

Inc. and CMH Manufacturing, Inc., were negligent and breached the warranty of merchantability

because an allegedly faulty electrical connection started a fire in the home.  Jurisdiction is based

on diversity of citizenship.

Defendant CMH has moved for summary judgment on the grounds that plaintiff's claims

are foreclosed by the Massachusetts statute of repose, Mass. Gen. Laws ch. 260, § 2B, or,

alternatively, that plaintiff has failed to put forth sufficient facts concerning the origins of the

fire.  Because the statute of repose applies to the claims, the motion will be granted.

**I.**   **Background**

    **A.**   **Factual Background**

The following facts are stated as set forth in the record and are undisputed except as

noted.

Pine Hill Estates is a manufactured-home park in Raynham, Massachusetts.  Pine Hill
Estates, Inc., is the management company that operates the park.  It collects rent, pays the park's
bills, maintains common areas, and keeps the streets in repair.  (Bumila Dep. at 15, ECF No. 35-
5).  Residents of Pine Hill Estates lease a plot of land and then purchase a manufactured home to
put on the property.  (*Id.* at 15).  Those purchases are made through June Sales, LLC, which is a
retailer of manufactured homes for Pine Hill Estates.  (*Id.* at 17).  June Sales purchases the
structure from CMH, which then adapts one of its model homes in accordance with any
customized features requested by the purchaser.  (Weldy Dep. at 122-24, ECF No. 35-4; Bumila
Dep. at 46-47).

The homes are manufactured at CMH's facility in Lewistown, Pennsylvania.  Prior to
leaving the facility, the structure is inspected to ensure it meets the National Manufactured Home
Construction and Safety Standards and complies with other regulations promulgated by the
Department of Housing and Urban Development.  (Weldy Dep. at 145, 148-49; Bumila Dep. 75-
76).

The structure at issue in this matter was manufactured and shipped in two sections.
When such a structure arrives on site from the factory, construction is nearly complete—all
plumbing and electrical wiring is installed and the interior trim is finished.  (Bumila Dep. at 31).
All that remains is for subcontractors hired by June Sales to join the pieces of the structure
together and connect the utilities; June Sales finishes the driveway and landscaping.  (*Id.* at 30).
The residents then occupy the new home as owners of the structure and leaseholders of the
underlying property.  (*Id.* at 15).

In 2004, Walter Neas purchased a home through June Sales known as a "Marlette Schult

Smart Buy II Sectional, Model No. 6828-316," which he customized in a variety of different ways.  (Ex. 3 at 1-2, ECF No. 35-3).  Among other things, he picked the flooring, the appliances, and the slope of the roof.  (*Id.*).  He chose a home designed to be suitable for New England weather, with a roof capable of withstanding 30 pounds of snow per square foot and thermal insulation sufficient to withstand low temperatures.  (*See id.*).

CMH then manufactured the home according to the requested specifications and shipped it in two pieces to Pine Hill Estates.  (*Id.* at 4; Bumila Dep. at 26-31).  The two pieces were then joined together by subcontractors into a completed building.  At some point thereafter, Walter and his wife Angela took up residence in their new home.  (Ex. 6 at 4, ECF No. 35-6).

On August 17, 2016, a fire occurred at the Neas's home.  (Ex. 7 at 2, ECF No. 35-7).  The Raynham Fire Department responded to the incident; notes from the day of the fire indicated that the fire was unintentional and identified "electrical wiring" as the "equipment involved in ignition."  (*Id.* at 4).  Peter Bumila, the president of Pine Hill Estates and the manager of June Sales, also visited the home on the day of the fire.  (Bumila Dep. at 64).  He reported that the structure had "heavy smoke damage" and that there was charred wood underneath it at the "source of the electrical problem" and "source of the fire."  (*Id.* at 64-65).  He noted charring near an electrical connector located along the wall where the two segments of the structure were joined during installation.  (*Id.* at 65-66).

The connectors complete the electrical circuits, allowing for power to flow between the two halves of the building.  (*See* Weldy Dep. at 50-55).  Each half of a connector is installed by stripping insulation from the end of a conductor cable, separating the conductor wires within that cable, pressing each wire into an assigned slot in one half of a plastic assembly, and then sealing the assembly covers together.  (Ex. 13, ECF No. 37-2; Weldy Dep. at 61-63; Morse Report at 16-

18, ECF No. 35-9).[1]  The mating end of that sealed plastic assembly connects with the other half

of the connector, which is assembled in the same fashion.  (Morse Report at 16).  The connector

halves were installed by members of defendant's electrical team at the factory so that the two

halves could be easily connected by the on-site contractors.  (*See* Weldy Dep. at 57-64; Bumila

Dep. at 87-88).

Experts for both Safety Insurance Company and CMH agree that the fire originated at the

electrical connector.  (*See* Williams Report at 31, ECF No. 35-8; Morse Dep. at 57-58, ECF No.

37-1).  However, they disagree as to the fire's cause.  CMH's expert opines that the connector

overheated at the point of connection between the two halves of the device.  (Morse Report at

21).  His report states that "[t]he specific mechanism that caused the overheating of the subject

connector is undetermined."  (*Id.* at 22).  Safety Insurance's expert opines that the fire originated

in one of the connector halves due to "physical damage . . . during factory assembly."  (Williams

Report at 33).

After the fire, in accordance with the insurance policy, Safety Insurance paid for the

damages to the structure and personal property.  (Compl. ¶ 11).  It then brought this action as a

subrogee of Walter Neas.

### B.  Procedural Background

On August 19, 2019, Safety Insurance filed this action in Massachusetts Superior Court.

On September 25, 2019, defendant CMH removed the action to this Court, alleging diversity

jurisdiction under 28 U.S.C. § 1332.  The complaint alleges that CMH was negligent in the

manufacture of the electrical connection device and the wiring of the home.  The complaint also

---

[1] The plastic assembly is called a Molex "Self-Contained Power Connector." (Ex. 13 at 2, ECF No. 37-2).

alleges that CMH breached its warranty of merchantability.  (Compl. ¶¶ 12-43). [2]

On May 10, 2021, CMH moved for summary judgment on all counts.

## II.   <u>Legal Standard</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.   <u>Analysis</u>

CMH has moved for summary judgment on two grounds.  First, it asserts that, as a

---

[2] Plaintiff also asserted similar claims against Marlette Homes, Inc.  However, Marlette Homes was voluntarily dissolved effective December 29, 2000.  (Def. CMH Notice of Removal, Ex. C at 2-3).  Moreover, it does not appear that it was properly served.  (*Id.*, Ex. D).  As a result, the Court lacks personal jurisdiction over Marlette Homes and the claims against it will be dismissed.  *See Omni Cap. Int'l, Ltd. v. Rudolf Wolf & Co., Ltd.*, 484 U.S. 97, 104 (1987).

designer and builder of manufactured homes, it is protected by the Massachusetts statute of repose, Mass. Gen. Laws ch. 260, § 2B.  That statute forecloses tort claims brought more than six years after the completion of an improvement to real property.  Second, it argues that Safety Insurance has failed to present sufficient evidence that CMH's alleged negligence caused the fire.

Safety Insurance contends that the statute of repose does not apply because defendant did not engage in the type of design or construction activity protected by the statute.  It also contends that it has presented sufficient evidence from which to infer that the faulty electrical connector made by CMH ignited the fire.

For the reasons set forth below, the Court concludes that as a matter of law the statute of repose applies and is dispositive of both claims.

A.    <u>The Massachusetts Statute of Repose - Generally</u>

Massachusetts has enacted a statute of repose for tort actions arising from improvements to real property.  Mass. Gen. Laws ch. 260, § 2B.  The statute provides that an action alleging "deficiency or neglect in the design, planning, construction, or general administration of an improvement to real property" is subject to a six-year limitations period.  *Id.*[3]  That period begins to run upon "the opening of the improvement to use" or "substantial completion of the improvement and the taking of possession for occupancy by the owner," whichever is earlier.  *Id.*

According to the Supreme Judicial Court, the legislature's main object in enacting § 2B

---

[3] The statute provides in relevant part:

Action[s] of tort damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property, other than that of a public agency . . . shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall actions be commenced more than six years after the earlier of the dates of:  (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.

Mass. Gen. Laws ch. 260, § 2B.

was to limit liability for those in the construction industry in the aftermath of case law that

abolished "the long-standing rule that once an architect or builder had completed his work and it

had been accepted by the owner, absent privity with the owner, liability was cut off as a matter of

law." *Stearns v. Metro. Life Ins. Co.*, 481 Mass. 529, 533-34 (2019); *see Klein v. Catalano*, 386

Mass. 701, 708-09 (1982).  Thus, the law prevents those involved in the construction industry

from being subject to potential liability "when architectural plans may have been discarded,

copies of building codes in force at the time of construction may no longer be in existence,

persons individually involved in the construction project may be deceased or may not be

located." *Stearns*, 481 Mass. at 534.  Although "[o]n its face, § 2B defines the protected actor

largely by reference to protected acts," persons, such as architects, engineers, or contractors, who

employ "individual expertise" in the design, planning, or construction of real property are

generally entitled to the protection of the statute.  *Dighton v. Fed. Pac. Elec. Co.*, 399 Mass. 687,

694, 696 (1987).

A defendant invoking the protection of § 2B must satisfy three requirements:  the cause

of action must sound in tort; the alleged tort must arise from the defendant's involvement in an

improvement to real property; and the time period specified in the statute must have run.  *See*

Mass. Gen. Laws ch. 260, § 2B.  Here, the parties do not dispute that plaintiff's actions sound in

tort, nor, if the statute of repose applies, the deadline for bringing an action has long ago passed;

the property was first occupied in 2004, and this action was not commenced until 2019.  The

question is therefore whether defendant designed or constructed "an improvement to real

property."

**B.      "Improvement to Real Property"**

The statute of repose does not define the term "improvement to real property."  *Dighton*,

399 Mass. at 696.  The SJC has interpreted that phrase to mean "a permanent addition to or

betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Conley v. Scott Products, Inc.*, 401 Mass. 645, 647 (1988) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1138 (1961)).

In many circumstances, however, that definition fails to provide meaningful guidance as to whether the statute's protection applies. *See Dighton*, 399 Mass. at 697.[4]  To discern whether an actor is a protected party, courts are required to engage in a "fact-based activities analysis" that considers "the motivation of the actor in producing the improvement." *Snow v. Harnischfeger Corp.*, 12. F.3d 1154, 1159 (1st Cir. 1993).

Architects, construction engineers, and builders fall clearly within the statute's scope. *See Dighton*, 399 at 697.  The statute, however, does not protect "materialmen" or "mere suppliers of standardized products." *Id.* at 695-96.  Rather, those who "render particularized services for the design and construction of particular improvements to particular pieces of real property" are covered by the statute.  Mass. at 696.

Thus, in *Dighton,* the manufacturer of a circuit-breaker sought protection under § 2B from liability for an apartment fire, even though the manufacturer had not been involved in the design or construction of the building.  The court eschewed a literal interpretation of § 2B, adopting a functional inquiry as to whether the manufacturer had rendered individualized

---

[4] The *Dighton* court illustrated that point by way of a hypothetical where a sculpture was welded to a building.  Although such an addition to the property may be an improvement to real property according to a dictionary definition, that definition offers little guidance as to whether the sculptor was engaged in the "protected *activity* of 'improvement to real property.'" *Dighton*, 399 Mass. at 697.  The court explained:

> If he produced the sculpture on commission by the developer to specifications provided in part by the architect and the engineer, we might conclude that he is protected by § 2B; but if he mass-produced the sculpture and sold it for use in a variety of contexts, or for incorporation into any building, we would conclude that he had been involved merely in the activity of producing and selling a fungible commodity, and not in the activity of improving real estate.

*Id.*

services for a specific piece of real estate. *See id.* at 696-98. It concluded that the manufacturer was a mere "producer and seller of 'goods,'" not entitled to the protection of the statute, even though the product was designed to be, and was in fact, incorporated into a building. *Id.* at 698; *see also Colomba v. Fulchini Plumbing*, 58 Mass. App. Ct. 901 (2003) (statute of repose did not apply to plumber installing a boiler who otherwise did no structural, design, or customized work on the property); *Fine v. Huygens*, 57 Mass. App. Ct. 397, 403 (2003) (statute of repose did not apply to supplier of "stock windows").

Whether a supplier of construction services or products is entitled to the protection of the statute often turns on whether the services were particularized to the project, or the products were customized for the job. *See*, *e.g.*, *Snow*, 12. F.3d 1154 (1st Cir. 1993) (statute of repose applied to designer and manufacturer of a crane that was designed according to customer specifications for specific plant); *Agri-Mark, Inc. v. Niro, Inc.*, 214 F. Supp. 2d 33 (D. Mass. 2002) (statute protected firm providing individualized engineering services and hardware required for milk evaporator upgrade); *McDonough v. Marr Scaffolding Co.*, 412 Mass. 636 (1992) (statute protected supplier of bleachers, where supplying the product was incidental to its primary function of performing particularized construction services in assembling and installing bleachers); *Parent v. Stone & Webster Eng'g Corp.*, 408 Mass. 108 (1990) (statute protected construction engineering company that installed an electrical distribution panel at electrical generating plant); *Szulc v. Siciliano Plumbing & Heating, Inc.*, 99 Mass. App. Ct. 729 (2021) (applied to plumber installing water heaters where installation required "judgments about the design and flow of the water to maximize the hot water system"); *Fine*, 57 Mass. App. Ct. at 403 (statute protected a supplier of manufactured wall panel system that was "not a fungible product designed for public sale or for general use," but "a component of an exterior wall system " that

was "manufactured specifically" for the project "pursuant to the specifications of architects and engineers," and the supplier "collaborated in the design and erection of the panels'); *Rosario v. M.D. Knowlton Co.*, 54 Mass. App. Ct. 796 (2002) (statute protected a supplier of a hydraulic lift who provided individualized expertise and services, collaborated in its design, supervised its installation, and specified and supervised building modifications).  However, suppliers of products that are only minimally modified or customized to meet the requirements of the project are not protected.  *See Fine*, 57 Mass. App. Ct. at 403 ("Many products that are mass produced may also be produced to order, or cut to fit the needs of a particular project, but this alone is not sufficient to bring a supplier within the purview of § 2B.").

## 1.    <u>Statute of Repose as Applied to the Manufactured Home</u>

At first blush, it appears that the manufactured home in this case was an "improvement to real property," as that term has been interpreted by the SJC.  The construction of the home was a "permanent addition" to real property; it "enhance[d] the capital value" of the property; it "involve[d] the expenditure of labor or money"; and it was "designed to make the property more useful and valuable" than before.  *Conley*, 401 Mass. 647.  Defendant designed, engineered, and constructed the home in its entirety, with the exception of the final assembly of the two halves at the site.

The disputed issue arises from the fact that defendant manufactured the structure in an off-site factory, not on the property where it was erected.  Plaintiff thus contends that defendant was a mere supplier of a stock "product," not a customized building designed for a specific piece of property.

Massachusetts courts have not had occasion to address specifically the applicability of § 2B to builders of manufactured homes.  Nonetheless, the weight of authority suggests that manufactured homes should be treated similarly to homes constructed on-site using traditional

methods.

First, as noted, defendant performed all of the principal roles—architect, engineer, and builder—that the statute is designed to protect.  The fact that those services were performed off-site does not obviously compel the conclusion that the statute does not apply.  Presumably, even with the most complex and customized structures, virtually all architectural and engineering services are performed off-site.  And it is commonplace for builders to employ prefabricated components, such as rafter systems, even when building a customized home.

Thus, in *Cournoyer v. Massachusetts Bay Transportation Authority*, 744 F.2d 208, 210 (1st Cir. 1984), the defendant was the designer and manufacturer of a "pre-fabricated, pre-engineered metal building," which (according to the plaintiff) was "mass-produced in much the same way as a metal tool shed from Sears Roebuck."  Plaintiff asserted that defendant was not protected by § 2B because the building was a factory-manufactured product rather than an improvement to real property.  The First Circuit disagreed.  Applying a dictionary definition of "improvement," the court stated that "there is nothing inherent in the nature of a prefabricated building that would take it out of this definition."  *Id.*  The court therefore held that § 2B applied because the case fell "squarely within the terms" of the statute of repose.  *Id.* [5]

At least two state courts from other jurisdictions have applied a similar statute of repose

---

[5] In *Klein*, the SJC stated that the Massachusetts legislature may have excluded suppliers and manufacturers from protection under § 2B because manufacturers can adopt high quality-control standards in a factory setting, whereas architects and contractors utilize expertise that is applied to projects individually and consequently not "susceptible to the quality control standards of the factory."  386 Mass. 701, 716-717 (1982).  That suggests that *Cournoyer*, which involved a manufactured product, might be in some tension with *Klein*.  However, the SJC was responding to an equal-protection challenge to § 2B and therefore positing rational bases that the legislature could have entertained for limiting the liability of those in the construction industry; it was not outlining the scope of the statute.  In addition, the SJC has cited *Cournoyer* as support in later decisions, suggesting that *Klein* and *Cournoyer* are not at odds.  *See Sullivan v. Iantosca*, 409 Mass. 796, 799-800 (1991); *Parent v. Stone & Webster Eng'g Corp.*, 408 Mass. 108, 111 n.5 (1990).  In the *Cournoyer* decision itself, the First Circuit upheld the constitutionality of § 2B by citing the rational bases stated in *Klein*, including the rationale that the work of architects and contractors is not easily subjected to quality control.  744 F.2d at 212-13.

to manufactured homes.  *See Miles v. Deluxe Bldg. Sys. Inc.*, 2009 WL 2224258, at *4 (N.J. Sup.

Ct. App. Div. 2009) ("[W]e perceive no reason to exclude modular or mass-produced homes

from the meaning of 'improvements to real property.'"); *Frankenmuth Mut. Ins. Co. v. Marlette*

*Homes, Inc.*, 456 Mich. 511, 517 (1998) ("[W]e can identify no bright line that causes a

traditional home, constructed on the property where it will remain, to be so fundamentally

different from a 'manufactured' home that is largely constructed off-site.").  *But see George v.*

*Western Homes Corp.*, 2007 WL 2138602, at *2 (D. Or. 2007) (finding that manufactured home

was not real property but rather a product encompassed by product-liability statute of repose).

Although those cases involved facts and law not identical to the present matter, they support the

conclusion that manufactured homes are improvements to real property, and otherwise-protected

architectural, engineering, or construction activities should not be deprived of the statute's

protection merely because of the location of the home's construction.[6]

Plaintiff argues that suppliers of standard products that have been only minimally

modified do not qualify as protected actors under the statute.  *See Fine* 57 Mass. App. Ct. at 403.

To be sure, the "Marlette Schult Smart Buy II" house bought by the Neases likely shares a great

many similarities with other houses of the same model.  Yet those similarities do not necessarily

place defendant's design and construction of the home here beyond the protection of the statute.

And even if it is assumed that the homes are "products," not buildings, plaintiff's argument still

fails.  Courts have held that actors engage in protected activity when they customize a standard

---

[6] Plaintiff contends that *Frankenmuth* is inapposite because the court held that the statute of repose applied to a manufactured-home builder who affixed the home to the property, rather than a builder that worked off-site only.  It is true that the facts and law in *Frankenmuth* do not fully align with this case, but that court's statement that manufactured homes are not mass-produced products and bear great resemblance to traditional homes is persuasive. *See* 456 Mich. at 515 (1998).  Plaintiff's contention that *Miles* is not persuasive has even less force—even though the injury arose from the collapse of a deck and not the manufactured home to which it was attached, the court affirmed summary judgment partly on the grounds that the company that manufactured the home was a protected party under the New Jersey analogue to § 2B.  *See* 2009 WL 2224258, *4-5.

design to meet the specific needs of a particular piece of property.  *See Snow*, 12 F.3d at 1158-59
(holding that § 2B applied to designer of crane made from allegedly standardized materials and
components and according to a design drawing that was duplicated from previous project and
then modified); *see also McDonough*, 412 Mass. at 643-45 (designer of bleachers was protected
actor because bleachers were designed for a specific hockey rink); *Rosario*, 54 Mass. App. Ct. at
801 (designer of hydraulic lift was protected actor because the lift had been made according to
specifications provided by customer).  Thus, defendant need not design and build the entire home
from scratch to render the kind of "particularized services" to which the statute of repose applies.

 Here, the evidence suggests that the home was not a superficially modified standardized
product.  The sales order for the home enumerates several customized features—including the
desired flooring material, the pitch of the roof, the material for the doors, the design of locks, the
windowsills, the shutters, and the wiring of telephone and television connections.  (*See* Ex. 3).
The design of the house had to be appropriate for New England weather, evidenced by the
Neases paying more for a home capable of withstanding high winds in coastal areas, bearing
significant snowfall on the roof, and maintaining proper warmth despite the winter cold.  (*See
id.*).  Defendant's customers generally make similar specifications, and sometimes more
substantial modifications, such as altering the original floorplan.  (Bumila Dep. at 46-47).
Defendant thus adapts each home it sells to each customer's specifications, even if many aspects
of the structures are standardized.

 Plaintiff also notes that manufactured homes are treated elsewhere in the law as either
personal property or commercial goods, not improvements to real property.  Plaintiff points out
that manufactured homes are treated as personal property and exempt from real-estate taxes
pursuant to Mass. Gen. Laws ch. 59 § 5, cl. (36), and that they are considered commercial goods

under the Uniform Commercial Code because they are movable at the time of sale.

Plaintiff is correct that manufactured homes are "generally exempted from real property taxes" and "classified as personal property."  Mass. Attorney General's Office, *The Attorney General's Guide to Manufactured Housing Community Law* 5 (2017), available at https://bit.ly/3lKUCSB, ("Attorney General's Guide"); Mass. Gen. Laws ch. 59, § 5, cl. (36).  However, that is mostly a consequence of the peculiarities of taxing manufactured-home communities, where the home and the underlying land are owned by two different parties.  In those circumstances, the property owner pays the real-estate taxes, but that cost can be recovered by charging the manufactured-homeowners rent.  *See* Mass. Gen. Laws ch. 186, § 15C (explaining that lessors can offset increases in real-estate taxes by increasing lessee's rent).  In addition, homeowners pay license fees—in lieu of personal property taxes—to the property owner, who then turns those fees over to the town.  Attorney General's Guide at 5; Mass. Gen. Laws ch. 140, § 32G.  So, while manufactured homeowners do not formally pay real-estate taxes, those taxes are functionally paid in the form of rent and license fees.

Under some circumstances, manufactured homes have been classified as real property and taxed as such.  In *Ellis v. Board of Assessors of Acushnet*, the SJC upheld an Appellate Tax Board decision that a manufactured home, despite being situated in a manufactured housing community and subject to a license fee, was not exempt from real-estate taxes under Mass. Gen. Laws ch. 59, § 5, cl. (36).  358 Mass. 473 (1970).  In that case, the SJC reviewed an Appellate Tax Board decision stating that a manufactured home installed upon a permanent foundation was, for all intents and purposes, real estate in the traditional sense:  "[I]n almost every practical respect concerning the design, architecture, size, accommodations, durability, permanence, character, and use, the structure looks like and serves the purpose of a conventional home."  *Id.*

14

at 475.  As a consequence, the Tax Board had held that the assessment of a real-estate tax was appropriate.  *Id.*  The SJC agreed and opined (albeit *in dicta*) that in light of the similarities between manufactured homes and traditional dwellings, to hold otherwise would create a "dual standard of taxation" in violation of the Massachusetts Constitution.  *Id.* at 477.  As a result, under certain circumstances, manufactured homes are taxed as real property.  *See Gouck v. Bd. of Assessors of Town of N. Attleboro*, 2009 WL 1366279, at *5-6 (Mass. App. Tax. Bd. 2009) (upholding assessment of real-estate tax upon property improved by manufactured home installed upon permanent foundation); *cf.* 4 MASS. PRAC., TAX'N § 11:18 (5th ed. 2021 update) ("The [Department of Revenue's] position is that if the mobile home is affixed to real property, its sale is not taxable. If it is not so affixed, it will be considered as tangible personal property and subject to sales tax.").

It is also true that sales of modular homes constitute "transactions in goods" under the Uniform Commercial Code, because the homes are "movable at the time of identification to the contract for sale."  *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 581 (1982) (holding manufacturer subject to breach of implied warranty of merchantability claim for sale of home with defective roof).  But installed manufactured homes are "largely immobile as a practical matter."  *Craw v. Hometown America, LLC*, 2019 WL 1298588, at *1 (D. Mass. 2019) (quoting *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 523 (1992)).  They are fixed to the land, draw power and water from utilities, and otherwise possess the characteristics of real property, and the law generally treats them accordingly.  For example, the construction of manufactured homes is subject to federal regulations promulgated by the Department of Housing and Urban Development.  *See* 24 C.F.R. § 5401, *et seq*.  Under Massachusetts law, the Manufactured Housing Act "establishes a statutory scheme intended to protect tenants of manufactured housing

15

communities" because "[b]oth the Legislature and the courts of the Commonwealth have recognized that [those communities] provide a viable, affordable housing option" to many who are "often lacking in resources and deserving of legal protection." *Greenfield Country Ests. Tenants Ass'n, Inc. v. Deep*, 423 Mass. 81, 83 (1996). To protect those communities, that law sets forth provisions designed to "avoid discontinuances of manufactured housing communities and to ensure tenants of such communities are not left at the peril of their landlords due to a practical inability to relocate a manufactured housing unit." *Id.* at 86. And when lawsuits concerning manufactured homes arise under the Massachusetts Consumer Protection Law, Mass. Gen. Laws. ch. 93A, those actions fall within the subject-matter jurisdiction of the Housing Court, even though similar actions involving movable goods do not. *See Patry v. Liberty Mobilhome Sales, Inc.*, 15. Mass. App. Ct. 701, 704-05 (1983).

In any event, whether manufactured houses are goods or real estate for other purposes is not the question at issue. The text of § 2B does not distinguish between objects governed by contract law or property law. Nor is the statute's scope determined by property-law doctrines, such as the law of fixtures. *Dighton*, 399 Mass. at 697 (explaining that word "improvement" in statute does not implicate "that tangle of highly technical meanings, often distinct in diverse legal contexts, which is the law of fixtures").

Finally, plaintiff contends that defendant failed to engage in any activity protected by § 2B because it sold the home to a retailer, not the ultimate owner; it was not directly involved with the installation of the home on the plot in Pine Hill; and, indeed, it had no knowledge where the home would be installed. But nothing in the law mandates that a protected party must directly implement the improvements on the property itself. The statute protects parties involved in the "design, planning, construction, or general administration of an improvement to real

property."  Mass. Gen. Laws ch. 260, § 2B.  That protection is not lost if a party fails to set foot

on the physical property.  *See Snow*, 12 F.3d at 1156, 1158 (designer of customized crane

encompassed by statute even though not involved in physical construction of facility on

property).  To find otherwise would countenance a hyper-technical reading of the statute that

undermines the functional inquiry set forth by the SJC.

In summary, CMH is entitled to the protection of the statute of repose based on the fact

that the manufactured home was an "improvement to real property."

### 2.    Statute of Repose as Applied to the Electrical Connector

Alternatively, plaintiff contends that defendant was a mere supplier of goods with respect

to the connector that allegedly caused the fire.  *See Cournoyer* 744 F.2d at 210-11 (stating that

the statute of repose may not apply to designer of building if injury arose from designer's

negligent act "*committed in its role as supplier*") (emphasis in original); *Dighton*, 399 Mass. at

695 (stating that the court may conclude that an actor served solely as a supplier if it finds that it

did not "performed protected acts," such as "render[ing] architectural or engineering services for

the construction of the building.").

Here, defendant was the actor primarily responsible for designing and constructing the

home.  When the structure arrived at Pine Hill, it was "95 percent complete" with the interior

completed and the plumbing and electrical wiring installed.  (Bumila Dep. at 31).  All that

remained to be done on site was to join the two pieces of the home and connect the utilities.

(*Id.*).  As a consequence, the defendant was intimately involved in the construction of the home

and not solely a supplier of component materials.  Plaintiff cannot seek to circumvent the statute

of repose by casting defendant as a supplier of a component part when its primary role was to

design and build the house.  *See Stearns v. Metro. Life. Ins. Co.*, 379 F. Supp. 3d 102, 104-05 (D.

Mass. 2019).

It is true that a builder may be held liable for an injury arising from a defective appliance for which the builder acted merely as a supplier.  *See Cournoyer*, 744 F.2d at 211 n.1. ("[W]ere a single defendant to have designed a residential structure and supplied, say, a faulty, mass-produced plumbing fixture that resulted in an injury, we do not think that he would necessarily be protected by [§ 2B] in his role as supplier."); *cf. McMillan v. Sears Roebuck & Co., Inc.*, 2002 WL 1676365, at *1 (Mass. App. Ct. 2002) (holding that alleged tort arose out of the role of Sears as contractor for bathroom remodeling and not as supplier of bathroom fixtures).  In this case, whether defendant benefits from the protections of § 2B depends on whether it acted as a builder or supplier when it furnished the electrical connection device.

Nothing in the record suggests that defendant was a manufacturer, a wholesaler, or a retailer of Molex connectors.  Instead, defendant utilized the connectors only in its capacity as the home's builder, in the same way it used nails, lumber, or other components; the electrical connector was a component incorporated into the overall wiring system for the house.  The home is not simply an assortment of fungible component parts, all of which are "supplied" by defendant.[7]  Defendant's use of the connectors thus arose directly from its primary role as the home's builder.

For those reasons, plaintiff's contention that defendant was a mere supplier of electrical connector devices is without merit.

---

[7] Plaintiff mischaracterizes the installation of the devices as the "manufacture" of a fungible product.  As is evident from the assembly process, defendant does not manufacture a fungible connector; rather, members of defendant's electrical team use connectors to facilitate what is essentially the splicing together of the conductor cables.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor, IV

F. Dennis Saylor, IV

Dated:  December 3, 2021                 Chief Judge, United States District Court